Case No. 15-1039 et al. Hawaiian Dredging Construction Company, Inc. Petitioner v. National Labor Relations Board Mr. Marr for the petitioner, Mr. Casterly for the respondent, Mr. Rosenfeld for the intervener Mr. Marr for the petitioner, Mr. Casterly for the respondent, Mr. Rosenfeld for the intervener Good morning, your honors. My name is Barry Marr and I represent Hawaiian Dredging, the petitioner in this action. The company's position is that the board's decision is not supported by substantial evidence and that enforcement should be denied. The issue is the company's treatment of welders after the company lawfully terminated a collective bargaining agreement and lawfully suspended its operations. According to the board, the welders were unlawfully terminated because they were affiliated with the Boilermakers Union. As the decision states, this case turns on motive. The General Counsel has the burden of establishing motive. I don't think... Turns on what? I didn't... If you could repeat your statement. Yes. The case turns on motive and the General Counsel has the burden to establish motive in this case. I'm just trying to understand some factual things about how this ADEF relationship works. When you have an agreement with a union for specific craftspeople, do you actually have individual employment contracts with each welder? Or do you essentially have the agreement with the union and then they just send out whatever welder when you need a welder? Correct. There's one collective bargaining agreement and that covers all workers. And when the company needs a worker, it contacts the union. The union dispatches a worker to the company and then the worker works under that collective bargaining agreement. So you don't have any direct employment relationship with any individual welder? Correct. It's all under the collective bargaining agreement and pursuant to the collective bargaining agreement. So I'm trying to understand the concept here of either terminating or laying off welders. How are you supposed to lay someone off if they don't work for you? You just aren't working with that union anymore. The board, we view this as a layoff because that's how the company has always treated workers when there's not work to be done. But you don't, you're laying off the union? Or who are you laying off because you don't actually employ these welders directly yourself? It's a lot of odd terminology here for essentially I guess what is a hiring hall. We actually do directly employ the laborers. It's in the nature of a temporary employment. The labor is requested. It's dispatched from the union hall to the company. The company puts the worker on their payroll and treats them just as they would an employee in the ordinary course. And then when the work is completed, they send the worker back to the hiring hall. And so imagine you had an ongoing relationship with this union and on Monday you need five welders and they send five welders out and for two days I guess they're your temporary employees while they're doing your work. And then that work finishes. And next week you'll need more welders, but you don't need any more for Wednesday, Thursday, Friday. Are those welders deemed laid off Wednesday, Thursday, Friday? Yes. Either, you know, in this case, quite frankly, the welders were longtime, many of them were longtime employees because the company had a continuing need for welders. So they might work on job A Monday through Thursday and then on Friday they might be switched to job B and the next week they might go to job C. So there was, with a number of the welders, a long-term employment relationship where they were continuously employed, but these welders were also laid off if there was not work to be done. They were laid off. No, you go ahead. They were laid off here because they were members of this union. Is that correct or not? No, that is not correct. They were laid off because on February 17th the company was advised by the National Labor Relations Board that there was not a contract in effect. The company, the parties had negotiated what they thought was an agreement. The parties treated it as an ongoing agreement. There were two disputed terms, and the company filed an unfair labor practice to confirm its understanding of the negotiations. The board's response was that there's not a complete agreement, there is no agreement. So at that point the company had the right, which it exercised, to terminate the collective bargaining agreement and the relationship. Okay. Since it no longer had a contract. But the company, as I understand your position, went out of that line of work because of not having the bargaining at that point? Is that your position? No. Only temporarily it is suspended. Only temporarily. You went back into it with an agreement with the Heifetters? Heifetters, correct. So would it not still be correct to say that whether you call it termination or layoff, you severed the relationship with those longtime employees because they were members of the subject union, right? No. It was not because they were members of the union. Had they been members of the Pipefitters union, would they have continued to work for you? Would they have continued? They could have if they were members of the Pipefitters union. So why then is it not accurate to say that they were terminated or laid off, because of their affiliation with the subject union? Under both collective bargaining agreements, both the Boilermakers and the Pipefitters, the workers had to be referred from the respective union. So prior to February 17th, when the company needed workers, it sought them from the Boilermakers union. After February 23rd, when it entered into an agreement with the Pipefitters, it had to go to the Pipefitters for workers. So in answer to your question, the Pipefitter could have worked, but he would have had to have been referred by the Pipefitters union. Both collective bargaining agreements, which are in evidence, are very specific that they're the exclusive source for referral, and both of them require that any worker that's dispatched be dispatched from that union. There is an exception. If the union is unable to dispatch a worker within a given period of time, in the Boilermakers agreement it was 48 hours, then the company is free to pursue a worker from a different source. The other question I had is I understand that the contract or the bargaining agreement with the union here was not actually with your company, but with this trade association that I guess consists of Hawaiian Dredging and two other companies? Is that correct? Actually, Hawaiian Dredging did have a contract with the Boilermakers. The contract was negotiated through the association, but Dredging was an actual signatory to the contract. So the association represented the three contractors in its negotiations with the Boilermakers. But the letter terminating the agreement was from the association, because the association does not intend to use the union. It doesn't say Hawaiian Dredging doesn't intend to use the union. That's true. And the association does represent all three companies, and it is able to bind all three companies. Did the other two companies terminate their work at the same time, the Boilermakers? One of them did. I'm not sure about the third. Could you ever argue to the board that the fact that another company did the exact same thing at the same time for the same reason was part of your evidence as to why you didn't have an impermissible intent? We did.  We did present that evidence to the board, and initially the board dismissed the charge. It later reinstated the charge, and that's what led to the hearing in this case. But you didn't raise that point again with the ALJ? Correct. I would point to one piece of evidence about layoffs, since that was an issue that's been raised by two of the judges. I think the best evidence of what the company's practice was was the evidence provided by one of the alleged discriminatees. And this is at the appendix, page 96. The employee was asked the question, in other times that you had been laid off, had you been told that you would be recalled if work was available? The employee answered, we just get our layoff paper and go on unemployment. The next question, okay. And then you would be redispatched from the Boilermakers. The answer, yeah, whoever calls, whatever company called, then we get dispatched from the union. And were you, did the company provide any indication that the same process would occur after February 17th? Excuse me, after the February 17th layoff? The answer was no. The next question, did they say anything to make it seem different? No. So the company did the same with this layoff that it had done with all previous layoffs. When there wasn't work to be done, it sent the employees back to the hiring hall. The question of whether that's termination or a layoff, it was a discontinuation of the employment relationship. That's true. But it was not because they were members of a union. The credited testimony in this case was that the company worked under a collective bargaining agreement and only under a collective bargaining agreement. So when they did not have a collective bargaining agreement on February 17th, they laid everybody off who was associated with welders. Now the board, when it found animus, said that the company laid off the 13 welders and only the 13 welders. But that is incorrect. The company also laid off the statutory supervisor who oversaw those welders. So it's our position that that finding, that they laid off only the boilermakers, was crucial to their finding of animus. Does the record reflect whether that supervisor was recalled when you began to resume the work with the use of another hiring hall? Yes, he was recalled after the pipefitters agreement was entered into. Because did he join the pipefitters and pass their test or did he get to come back automatically? He was supervised. He could not have joined the union. Well, he can be covered by the collective bargaining agreement, but he was a statutory supervisor. That was alleged in the complaint and that was admitted by the company. Were you able to bring him back directly or did the pipefitters have some say in whether he could come back? He went through the pipefitters process. He was qualified as a pipefitter and then he was again designated as a supervisor once he was qualified as a pipefitter. So he could have been a member until he was re-designated as a supervisor? He could have, yes. And did the hiring hall thing work a little different? Yes. When you brought up Darlington, are you asserting an independent sort of Darlington claim as a barrier to, you know, this is just something you're entitled to do, we don't even get to Wright Line or Great Dane, or are you using Darlington to underscore your argument that it was permissible to temporarily terminate the work for the week until you had a new contract? We actually don't need Darlington for that. I'm just asking you which way you use it. Did you use it in your brace? And it wasn't quite clear how you were using it. The board acknowledged in this decision, both the board and the dissent, that we did have the management right to discontinue the work. The only issue from the board's perspective was whether we had the right to terminate the employees. And they said you had the right to suspend the work, you had the right to lay off the employees, but you couldn't terminate them. But there's no right to recall, as the board relied on. They pulled that really out of thin air. The statute certainly doesn't have a right to recall. Darlington really had nothing to do with that, right? Correct. Because I remember Darlington, there was no recall involved. Correct. They shut down the deal. Yeah. But with respect to the right to recall, it's not in the collective bargaining agreement. It was not the company's practice, as that employee indicated, to tell employees they had a right to recall. They were simply sent back to the hiring hall. That's what the company had always done, and that's what they did in this case. Had they not sent them back to the hiring hall, had they, assuming that there was a right to recall and assuming that the company had put them in some type of suspense while they tried to figure out what they were going to do, the employees could well have lost opportunity, because while they're not at the hall, they lose the opportunity to be referred out to other companies. But I thought the record here was, and maybe I misunderstood just the factual setting, when you talk about the employee being referred back to the hiring hall, it's the Boilermaker's hiring hall to which the employee was referred back. He had no right, after the February 17th letter, to expect any employment from your client unless he was able to pass the test that the pipefitters' union required. If he passed that test, then he might be one of the employees. You are correct. So when the company sent the employees back to the hiring hall, the employees had options. One option was to remain a Boilermaker and be referred out to other companies. But the association has already said they're not going to use the Boilermaker's union anymore. Correct. But other companies could use the Boilermaker's for their work. So they wouldn't, if they decided... So the employee just goes back on the open market, basically, to the union. Well, they go back to the hiring hall, as they did whenever there was a lack of work, and they're referred out to any company that has a collective bargaining agreement with the Boilermaker's. Now, at one time, that was line dredging. I'm just talking about your client and his relationship with the association. I thought your responses to Judge Millett were that the association covered three employers. It did. At least the letter was going to affect two of the three. Correct. And your answer now is the Boilermaker's union employees are just not going to be hired by the employers who are covered by this association. The Boilermaker, for a Boilermaker employee who previously worked for Hawaiian Dredging to return to Hawaiian Dredging, they would have to go to the pipefitters. So the board said regarding, and I think it was Mr. Valentin's testimony, this practice that the board had of only using welders when there was an 8A craft agreement. As I understand your argument, you're referring to those as collective bargaining agreements. Yes. The board says, first of all, there are those two periods of time. Yes. And so that was an indication to the board that this practice wasn't as ironclad as the, I think it was Mr. Valentin's testimony. Correct. So the administrative law judge credited Valentin's testimony, and he testified that the practice of the company was only to work under a collective bargaining agreement. The board said, hey, wait a minute. There were two times when you did not work under a collective bargaining agreement. One was October 1st through the 7th when the parties were still negotiating, and the other was November 1st through the 12th when the extension agreement had lapsed. And the judge said in her decision that negotiations continued. The judge never determined that the contract was not agreed to prior to November 1st. And I think the evidence is pretty clear that the parties felt they had reached an agreement. And the facts that support that is that Valentin testified, and, again, he was credited. He testified that he was advised by the boilermakers that the employees had ratified the agreement. What agreement are we talking about? To me, I'm thinking about this case in several ways. One is there was a collective bargaining agreement that expired. Yes. Then there are these separate 8A agreements. It's actually 8F. I'm sorry, 8F. The February 17th letter terminated the 8F agreement insofar as the boilermakers' union was concerned. So there were two collective bargaining agreements that could be relevant. Both were pursuant to 8F. And 8F just means that it's a construction employer, and they're basically going to be using hiring halls. I understand what it is, but it's also not a collective bargaining agreement as I think of it as dealing with a union that represents a majority of the employees. It's an exception for the construction industry. You are correct. All right. So here we have these two separate 8F agreements. And Mr. Valentine testifies. So far as he knows, the company only has employees who are covered by these 8F agreements. And the board says, no, there's two times when you didn't. So this is not a strictly enforced practice as the board suggests. And your response is, as I understood it, there was an agreement. But I thought the board had already found there wasn't a meeting of the minds between the boilermakers and your client. So the initial agreement expired on September 30th. That was extended until October 27th while the parties negotiated. In the party's view, they reached an agreement, and that was the agreement that was ratified by the employees. So that was the agreement. This is a temporary agreement. No, it was actually a three-year agreement that would have taken effect upon the expiration, September 30th, of the old agreement. So your understanding of the record is that there was actually a new, what I'm going to call, umbrella collective bargaining agreement? Correct. And when the union responded, the boilermakers union responded by saying, we want these two extra terms. Correct. Essentially, the board was wrong when it found there was no meeting of the mind and there was no umbrella agreement. Well, I think what's really relevant is that the testimony, the credited testimony, was that we only work under a collective bargaining agreement. The board said, wait, there's two times when you didn't work under a collective bargaining agreement. The board basically excused the period from November 12th until February 17th, saying, hey, the parties thought there was an agreement. But the same applies to November 1st through November 12th because the parties thought there was an agreement then, too. So I think that period is pretty clearly not one that substantial evidence supports the board's finding. And the first period was you had both agreed to just sort of keep the status quo for essentially the month of October. Well, the company's view was that you would keep the status quo. The union disagreed with that, and there was a one-day work stoppage by five of the employees. But in the company's view, but there's also testimony, and this is in the appendix at page 130, that the union told the company the employees were confused on October 30th. And in the company's view, that's why they walked off the job. And the company wasn't going to lay them off or discontinue operations because of this confusion. The long-term practice of the company, going back 20 years, is to continue to work towards an agreement until one is reached, even if the agreement lapses. And the agreement that they work under is just the continued terms of the recently expired agreement. That's what they've done in the past, and that's what they did on September 30th. Thank you. Thank you. Good morning. Good morning, Your Honor. And may it please the Court, my name is Dave Casserly. I'm representing the National Labor Relations Board. This case comes down to a fairly simple situation, which is that Hawaiian Dredging had employed Boilermakers for a long time. After an ADEF agreement expired, it continued to employ those Boilermakers. But on February 17th, after collective bargaining negotiations had broken down between the parties, Hawaiian Dredging sent a letter to the union saying, We will not employ Boilermakers again. Not, we won't employ people referred to us by the Boilermakers hiring hall. We will not employ Boilermakers members in the future. We don't intend to use them. It fired all of its Boilermakers permanently. And then, yes, Your Honor. I understand this to be simple on your view, but it may not be as simple to us. This is not the normal. There are several things that to us do not meet what we usually see in an LBP. One of them is the animus here. Usually we see an employer who seems to have animus toward labor unions. Here it looks like the old days when the animus may be directed toward one union but not another. Am I reading that correctly, that what you're saying there, the animus is toward membership in this particular union rather than toward unions in general? Yes, that's correct, Your Honor. And it's also correct that going back to the beginning of the Act, in early cases under the Act, this was not uncommon. Not uncommon at all in those cases. Right. And there are cases going back 70 years finding that animus against one particular union is just as prohibited as animus against unionization generally. What makes it a little more complicated is the fact that this is a hiring hall or a pre-employment agreement rather than the typical CBA, which is the majority representation agreement in the United States. What happens now to the agreement that has been struck between the employer and the pipefitter? If we do as you pray and enforce your order, what does that do to the pipefitter's relationship with the employer? Well, Your Honor, I believe the pipefitter's agreement is in the record and there's a side letter to that agreement that deals with what happens to that agreement in the event of a court judgment. Claim that I don't have that at the front of my mind and tell me what it is that happens to it in the event of a court judgment. Okay. I believe that that agreement is negated in the event of a court agreement. I believe that's what the side letter says. I don't have it right in front of me. Do you believe that would oust the pipefitters from their new agreement and reinstate the relationship with the boiler makers? These are not hostile questions. Yeah, I understand, Your Honor. And no, it wouldn't reinstate the boiler makers' agreement or the pipefitters' agreement. I mean, that's not the remedy here. The remedy is just to reinstate those boiler makers who were fired because of their union affiliation. Since this is the current hiring hall situation, it may well be that there is no job this week for those employees to go to. Then there will be a job next week for the employees to go to. Then there might not be the next week. How is that going to work in a hiring hall? Well, Your Honor, that's actually not any different from the board's usual remedial practice, which is in many cases there's no jobs for employees after they've been discriminatorily discharged. And then the question is, you know, the board's order is to reinstate those employees to the same position or if such position doesn't exist, to a substantially equivalent position. And so, you know, that's an issue. If a company doesn't have a contract at that point on which it needs welders or whatever craftsman it is, then there's no such thing as a substantially equivalent position. I'm just not sure that I understand how this works in a hiring hall situation. Well, Your Honor, again, in an ordinary situation, if a union is the 9A and there's no work for a particular person who is discharged, if that person had been permanently replaced, you know, the board, that would be an issue for compliance that the board leaves for the second stage. I understand it would be an issue for compliance, but I'd like to understand how that's going to work. Well, if I didn't know it was an issue for compliance, I wouldn't ask the board. Yes, Your Honor. I believe that, I mean, the board would require discharging any welders who were not these discriminates. It's also, as a practical matter, this is several years later, it's unclear that the welders would necessarily even want reinstatement at this point. The ones who have gone out to other jobs, they may want to remain Boilermakers or remain being referred through the Boilermakers hiring hall. So it is a fairly complicated situation at that point in it, but they would probably require them to discharge any. If your question is would they require them to try to sign a contract to hire additional welders if there's too many welders for the work they have, no, that's not a typical compliance remedy that the board orders. Well, I think the reason we have these questions is that this is, I'm not sure the board's decision grappled with it, but this is a very different situation. The welders' relationship with Hawaiian Dredging was completely derivative of the Boilermakers' relationship with Hawaiian Dredging, correct? No, Your Honor. That's how an ADEF works. No, Your Honor. The ADEF requires that they were referred by the union. That's all the ADEF means. Their relationship then is governed by a collective bargaining agreement, the same as virtually any other collective bargaining agreement. But in an ADEF situation, you come into it with there's this preexisting pre-hire relationship between the union and the company. And the way you get to have a relationship with that company is because you're part of our union. Isn't that the whole point of the pre-hire and the ADEF? Your Honor, no. There's two differences here. One is that there's a difference between union membership, being part of a union, and being referred to an employer through the hiring hall. Unions are required to operate their hiring halls neutrally without regard to union membership. They cannot require somebody to become a member of that union in order to be a part of their hiring hall. The only thing they can require is that after that employee is referred to an employer, they can sign a collective bargaining agreement that requires that employee to then become a member of the union. And they can have seniority rules and other non-discriminatory rules for operating a hiring hall. But the way many ADEFs- Could these welders have done the work without being a member of the Boilermakers Union? The collective bargaining agreement would have required them to become a member of the Boilermakers. They couldn't have done the work without becoming a member of the Boilermakers Union. No, Your Honor. That's what I just said. They had to join the union to do the work. That's true, but that's also no different from any other- So when Hawaiian Dredging says, we're done with this union, it's not working for us, we've tried, we've tried for months and months and months, this isn't working, we're going to have a relationship with a new union. And so, the way this ADEF thing works is, if you're going to work for us, then if you want the work, that's fine, but you're going to have to do it through the pipefitters' agreement with us. And the pipefitters say, you've got to be part of us when you do the work, correct? Under ADEF, Your Honor, it's not actually- So it's true that they had to be under the previous collective bargaining agreement. It had a requirement that they would be members of the Boilermakers. That doesn't mean that they cannot be referred by another union if they're still members of the Boilermakers. But if they got there and got the job, they would then have to join the union that is in the union shop there. That's correct, Your Honor. They would have a seven-day grace- If they're going to have a job for more than seven days, they have to join the ADEF union. Correct, but they weren't given that option here, Your Honor. This is all about the seven-day grace period. Well, no, Your Honor. I just don't understand. You've got a company here that actually, to me, looks like it does all the stuff we want it to do. It's a long-term employer. It has these agreements with the union. And then things just broke down for whatever reason. Things broke down, and they said, it's not working. So now we're going to have an agreement with another union. And this is an ADEF situation. And so it's a pre-hire agreement. And so now our welders are going to come from the pipefitters. That's a perfectly permissible thing to do. And so why isn't it to go- I don't understand how they were supposed to keep these other folks on when the pipefitters said, here's our test. They can't come in unless they pass our test. That's not hiring them because you're favoring one union over the other. That's making decisions based on who I've got a pre-hire collective bargaining agreement with. That's not unanimous. That's just shifting the ADEF union. If what they had done is simply say, okay, we're not going to do this. We're not going to have a collective bargaining relationship with the boilermakers. Terminate that relationship. Start one with the pipefitters. Tell all of their employees, you must now become pipefitters. That's lawful. But that's not what they did. They fired all the pipefitters. Sorry, all the boilermakers. I'm sorry, Your Honor, I didn't- That's the conclusion. You're saying they fired them. How do we know they fired them as opposed to lawfully laying them off? You're saying because they fired them. That sounds a little circular to me. Well, that would. But there's other indications that they fired them, such as the separation notices didn't check layoff where they had before every other time. What I'm hearing is you've got an ALJ decision that credited testimony. It was adverse to the determination the board made. And I don't see the board wrestling with that anywhere in its decision. It just blows right past it and then imposes a new test that the ALJ didn't imply and didn't establish a record for. The board just blew right past all of it. Isn't that just by itself error? Well, Your Honor, in terms of not establishing a record for the right-line test, that part is not the case. In front of the ALJ, the parties litigated the right-line issue. And, indeed, in its responding brief to the general counsel's exceptions, which is in the record, Hawaiian Dredging did mention the right-line argument in its agreement with the judge that right-line wasn't applicable and that even if right-line were applicable, they had a footnote saying that they don't think it should be there. Was there a right-line theory before the ALJ? The general counsel didn't explicitly do so, but the complaint just alleges a general violation of 8A3. It was the ALJ's option not to use right-line there. And to the extent that there were arguments based on right-line that weren't raised to the board. Tell me what it is they used instead of right-line. What is the reason for this? The reason under right-line, Your Honor? Are you saying they followed right-line or not? Yes, this is a right-line and also a Great Dane case, as the board found. And under right-line, which is a test of basically motivation, the motivation for this action was the fact that they were boilermakers. And going back to— That motive determination, the opposite motive determination was made by the ALJ. Correct? Well, didn't call it right-line because nobody was doing right-line before the ALJ. But the part of Great Dane found it wasn't inherently destructive, found the motivation was entirely that we're letting you go because we're not going to work with that union anymore. You're here via that union. We don't work unless we have an agreement with the union, and then we'll go get a new one. And then they went out of their way to try to help those welders come in through that other union's route. And the ALJ made all these findings. And I don't see in the board decision grappling with that adverse evidence in the record or the adverse findings by the ALJ, which is kind of basic APA duty for the board. Well, Your Honor, in terms of the adverse findings in terms of Hawaiian Dredging trying to help the workers find employment with it through the pipefitters, the very simple way to do that would have been just to keep them employed. Then they wouldn't have to pass a welding test. The fact that you could have done something a different way does not mean you had motive. And it's not an answer to the ALJ's determinations about what motivated this company when it said there's no liability at all. Well, what is an answer to the ALJ's and what the board did grapple with is that the ALJ did not actually look carefully at the period during which there were no contracts in place during which they worked. Instead, the ALJ just said they always worked with the collective bargaining agreement. And so when the agreement ended, they – Because those two periods, come on, those two periods are exactly what you want employers to do. Don't you want them, when a collective bargaining agreement has ceased, to keep going on to the extent they can and the union works it to with the status quo instead of stopping everything? That's what they did. And then there was a dispute about whether there was another agreement. And they kept working in good faith while they were negotiating with a company of the union they'd had a longstanding relationship with. That's 100% different from when they got to the point and said, this isn't working. We're done. We cannot work with that union anymore. We're going to have to get another union. That's a completely different situation. Wouldn't you agree? Or at least that the board had to address that difference in the situation and didn't do so? Well, Your Honor, in the 8F context, there's no duty to maintain terms and conditions of employment after an agreement expires. The duty there – That's right. It's a good practice by a company. Maybe, but – No good deed goes unpunished, does it? Well, here, the company, sure, it had that practice. But it was with the union's agreement that it had that practice in the past. There's no evidence that there were other lapse periods. Does the lapse of an agreement equal animus? Not in and of itself, Your Honor. They let them off or terminated them or in some fashion ceased to have an employment relationship with them because their contract ended and they couldn't get it back together. Does that make animus? No, Your Honor. Thank you. But then what happened in addition to that in this case is they actually told the Boilermakers, we don't intend to use members of the Boilermakers, not just people referred by the Boilermakers hiring hall. So then when they get – what they could have done is just kept these Boilermakers on. We're an ADEF company. We've had a relationship with the Boilermakers, and now we're not going to, so we're not going to have that same relationship with the Boilermakers. That's all they were saying. At least that's something the board had to grapple with in its decision and didn't particularly given what the ALJ found about this employer. Well, Your Honor – Do you agree they at least should have addressed it and talked about it in their decision? But what the board did talk about is what they did more than that, and the board did say it addressed John Deklava in response to the dissent, and it said we do not quarrel with the fact that it's lawful for an employer to terminate a bargaining relationship and start one with a new union. That part the board did state that, but what happened here was they did that, and then they also fired all of these employees who they could have kept employed, and they told them it's because they were Boilermakers. They could have kept them employed, but they couldn't have kept giving them work once they had an agreement with the pipefitters union, correct? Yes, they could, Your Honor. Under ADEF, they can keep giving their current employees work. It's only if they were going to get a new – So they would have to change their whole mode of operating, which was we work with whatever union we have our ADEF agreement with. And their failure to change their entire 20-year history of operations means animus? No, Your Honor. They could have kept the employees who had been employed there for five years or longer doing the work they had been doing, which is also the – Under an ADEF agreement with the Boilermakers union. Yes, but those same workers could do the work under an ADEF agreement with the pipefitters. And they tried to help them do that, right? They tried to help them fit the pipefitters test. Right, but they wouldn't have had to do any of that if they had remained employed the entire time. The employees would have had seven days to switch their union membership, and the pipefitters can't tell a current employee, you cannot become a pipefitter because you haven't passed our welding test. That would be a violation of AB2 if they caused an employee to be discharged for any reason other than failure to pay dues. So all that would have happened in that case. In the typical ADEF case where an employer switches from one union to another, the employer keeps its employees the entire time, and the employees then have seven days to simply pay their membership dues and any nondiscriminatory initiation fees and become members of that new union. That's the typical case. Here, that didn't happen. Instead, they fired all of them. They didn't have any work for that seven days for the welders, correct? Yes, they did have work, Your Honor. That seven days they stopped welding work. They chose to stop welding work, but they had work to do. It wasn't stipulated in the record. I said Darlington could come in. They had a right to shut down an operation. They didn't shut down operations, Your Honor. It was a temporary stop for three weeks, and Darlington has never been. I'm sorry. What about Darlington? Okay. Darlington never has been applied to a temporary shutdown of this shorter duration. Moreover, that wasn't a theory that was brought to the board. They didn't cite Darlington in their brief to the board, which is also in the record. This is a theory that the dissent brought up. I think there's, what I asked your friend originally, there's two ways of talking about Darlington. One is as sort of this upfront defense to the entire action, and the other one is, no, it's illustrative of why the Darlington concept is illustrative of why not doing welding work for a week is not evidence of animus, and I had understood them to be using it that way from their briefing. And given that the board itself pulled right line out of thin air in its own proceedings, I think it's ill-positioned to complain about other people citing cases for the first time after the ALJ proceeding. Well, Your Honor, Section 8F of the Act doesn't bar the board from citing cases that hadn't been cited before, but it does bar a court from overturning the board based on a case or based on a theory that hadn't been. Complained, not citing, getting the law right and citing the right cases. That may be true, Your Honor, but to your point about Darlington in terms of how it's been used, I'm not aware of any case where Darlington has been used in the manner you're speaking of. Generally, Darlington is used as a total defense, as a this was a shutdown, our motivation doesn't matter. We could have had, and in Darlington itself, the employer clearly had ill motives. It decided, you know, I just really don't like this union and I want to be rid of them. And so it would be a typical 883 violation except that Darlington has this exception for employers who want to shut down their business permanently and allows them to do that. That doesn't really apply to this situation where we're talking about motivation, which was not an issue in Darlington. It was clear that there was ill motivation. Yeah. Yeah, you're on your move, and I know we had ill motivation. All right. Seeing as I'm over time, unless the court has any further questions, I request that you enforce the board's order in full. Thank you. Thank you. David Rosenfeld for The Intervener. Judson Tell, Mr. Cassidy's not correct. The only remedy sought in this case is back pay for the workers. Those of us who practiced before the board know there's a paragraph in the ALJ's decision in which he says a compliance specification issued because the board was able to determine exactly how much back pay was owed and was not seeking reinstatement because in the interim, Hawaiian Judging had offered everybody to come back to work. So there's no effect. The reinstatement is not really on the table. It's not. There was an issue. I just couldn't figure out what was going to happen. Is it one week of back pay? Pardon? Is it one week of back pay for that one seven-day period? No, and that's, Judge Millett, that's exactly the problem here. So your answer is no? It's back pay for how long? How long do you think this back pay period is? Well, it varies from worker to worker. And, Your Honor, Why is it determined? It was determined. How is it determined? It was the length of time before they found either alternative work as a boilermaker, but some of them went to work for Hawaiian Judging as pipefitters. None of them went to work within seven days. It took more than a month before the first one went to work for Hawaiian Judging. So in March, late March, two of them, including Mr. Kaufman, who's the supervisor, and I want to be clear, Mr. Maurer is correct, that it's not unusual in the construction industry to have a supervisor in the unit covered by the agreement. He gets the benefits, the health and welfare pension benefits, and that works because they move back and forth. I don't have any problem with it. I just wasn't quite sure how it was working. That's the way it works. As you know, this is not the kind of CBAs we usually see here. Well, it's interesting because even under 9A agreements, there can be referral procedures and hiring procedures, but this is unusual, and that's all I've done in my life for the most part, AF agreements. So, Judge Millett, you've kind of narrowed the question here because the fact is I'm not going to use the word fired. I'm going to use the word the board used and Ms. Gamara, the dissenter, used. They were discharged. And inconsistent with past practice, they weren't discharged because it was lack of work. If you look at all the forms in the record, every time they were, quote, laid off in the past, it was for lack of work, they knew they'd be called back. Here, when they were, quote, discharged, they knew there was work right there because they all saw it. They hadn't completed the tanks they were working on, and they were suddenly told, you're terminated. Mr. Coffman, in the record, was told by management, we're terminating the Boilermaker members, you need to tell them. So they were all discharged on time. Because we're no longer going to have an agreement with the Boilermakers Union, and we have one with the pipe fitters. Not at that time. Well, a week later, right. And until we get a new agreement, we're not going to do welding work because we only do our welding work when there's an 8F agreement in place. Well, that would be a much different case, and I think a much stronger case. Isn't that this case? We only do welding work when we have an 8F agreement in place. That's what the ALJ credited. And as soon as they, a week later, they had a pipe fitters union agreement. That's not what the workers were told what happened. What did the ALJ credit? Well, the ALJ credited that they had a reason, which is they only do work under the terms of the agreement. Right, that was a credited motive. Right. Can you point to me where the board decision addressed that credited finding by the ALJ and determined it unanimous? And the board said that's not strictly enforced here for several reasons. There were periods of time. Well, where did they say, but the ALJ credited this long history by the business. This is how they do their operations. I get that the board said, well, you continued while you were negotiating, which I think is a completely different animal from not working without any agreement or any prospect of an agreement. I get the board went back and talked about two things, which I think compares apples and oranges. But where do they say, we get the ALJ found, proper motive here? Because they said that's not strictly applied because they pointed to two circumstances where the company, in light of concern actually by the workers, in both in October when this situation arose where there's no contract, the union hands to a Hawaiian dredging letter that I wrote saying we can strike any time, and the company was upset about that. And then in November when this problem arose. But the company said an agreement has expired, but we are involved. We're still talking to you. We're going to work with you. We're trying to have negotiations, and we'll just continue the status quo of the prior agreement and the hopes, and we're planning to get one. We're talking about getting one through October, and it's going to be retroactive when we get it. So in their mind, there's going to be an agreement for this October. And I agree. In the construction industry, it makes a lot of sense to do that. Okay, but that's what was going on here. So it's apples and oranges to me when the board goes back and says that's the same thing as refusing to work with them when there's no agreement and no prospect of an agreement. The difference was that if you applied that concept on February 17th, what they would have told the workers was not you're discharged, and we're not using members of your union anymore because these workers had to go home and say, I just got discharged. We're not going to be using Boilermaker members anymore. I'm out of this long-term good job I've had with Hawaiian Dredging. Had they said to them, you are being laid off because we're having to make other arrangements and not sounded like it was a permanent discharge, this case would have been substantially different. And only until the workers were terminated, discharged that day, they had no clue that there would ever be employment for them again. And then within a week, the company signs an agreement with the pipefitters, and there's an important fact that the board doesn't – Just to be clear, they didn't know they'd be working with Hawaiian Dredging again. They can still go through the – But there were three employers, all of whom terminated the agreement, and there's no evidence in the record of any of them – They just told us only two did. And you think they didn't know about that? What about the testimony that counsel cited of one employee in his opening argument? Of one employee? Coughlin. Coughlin. Coughlin was the supervisor. Yeah. And he was terminated because of his membership also, but he was the first one rehired a month later. No, but I thought the significance counsel was suggesting of the testimony was that he said, no, they weren't told they'd be called back, but nothing was going to change from what had happened before. No, I don't think he made that representation. And, in fact, Coughlin testifies that he was expressly told they were terminating the members and was also told it was because there was no contract and it was done. And I – He was the supervisor who was terminated. Yes. And again – and what the pickle the company found itself in was when it met with the pipefitters a couple days later, the head of the pipefitters, this guy Castaneras, said very clear to them, we will not allow these boilermakers to come back to work for us because they're not members. And that's in the records several places where he testifies, and there's actually an affidavit from him that was supplied in support of the motion for summary judgment in which the pipefitters' head says, we're not letting them come back to work. We reject your request. Right. So that was a pickle because they were hoping that the pipefitters would then just bring their folks right back. Right? That's right. That doesn't sound like animus to me. Well, it was animus because, as the board points out, they were terminated because they were members because, as your honors phrased it, they had not been able to reach an agreement with the boilermakers' union because they got in this dispute over five cents, basically, over whether they had an agreement. The boilermakers said, no, we don't have an agreement. As you phrase it, the company said, we have an agreement. The region dismissed the charge. And so they said, we've had, as your honor pointed out, enough of the boilermakers. We can't reach an agreement. So we're going to terminate their members, discharge them. We're going to terminate our ADEF relationship with the boilermaker union. We do welding work under an ADEF relationship. We now have a new pipefitters' union. We went to them expecting and hoping that they would take our welders back in, that we would just be able to shift them over to the other union. But they ran into a pickle because of this other union's policies. As you phrase it, I just don't think that sounds like animus. Maybe they mishandled it. But given the findings by the ALJ that the board doesn't deal with, and given your own concession that they were trying to do this but ran into a pickle because of the other union, not because of their own intentions, that doesn't feel like animus to me. The pickle in pickling, if I can use that term, was of their own cause because had they said to the workers, the boilermaker members, we're going a different direction. But misstepping is not animus. Maybe they didn't handle it gracefully, and we can think in hindsight of other ways they could have handled it. But that's not the same thing as up front at the time animus. Could I understand your answer? Pardon? You were answering Judge Millett's question. Because they expressly said it was because of membership. The letter that they sent that was circulated, which is Appendix 295, says, since our prior agreement with the union terminated on September 30th, you are hereby advised that the association does not intend to utilize members of the Boilermakers Union for future work. It was membership. That's what the workers understood. That's what the union understood. If the word referrals had been used instead of members, would this be a different case then? Yes. If they had said, we do not intend in the future to use the Boilermaker hiring hall, then that would have been a different case. But they didn't. They said membership. And in the transcript, there are repeated references to members of the union. And that's what the members understood. No worker is going to understand anything else in this context other than what the company said. It's because of your membership, you're being discharged. And then they couldn't go back to work because they weren't both because of their membership. It's kind of an interesting footnote, if I may note. This Phil Nisgramara, the dissenter, says that they would have had to have given up their membership in the Boilermakers and become a pipefitter. And I'm not sure he's correct on that. I don't, you know, you can actually be dual members in many cases. And if you look at these records, some of these guys have been. There's no reason they couldn't be dual members. Is that correct, though? I don't think so. But there's nothing in the record that conclusively establishes it. My experience is that even in the Boilermakers, some were members of pipefitters and back and forth. But the problem here was that Castanero said you have to become a member before you can go to work as part of the application process. And so two of the members went to work, former members, in March. And it straggled out over the next couple of years. And the last one finally went to work in 2012. So the back pay for some of them is very short, very long. But to try to conclude this, on February 17th, they're discharged. They know it's not a layoff as ever in the past because there's plenty of work. They go away. They're not told anything. A deal is cut with the pipefitters. And I'm not complaining. It's an AF agreement, perfectly lawful to do that. And then they're all foreclosed from coming to work until they go through the application process. And the important point that Mr. Cassidy was making is that under a pre-hire construction agreement, you have to join on the eighth day. You have to pay your dues on the eighth day. You don't have to literally join. You have to pay your dues. To be referred by. Right. To be referred by. The pipefitters said we're not even going to refer them unless you join in advance, which was unlawful. So they threw this unlawful roadblock into That's not after the court, though. The pipefitter's position on that, right? It is before you because the administrative law judge, I'm sorry, the dissent points this out. And as Mr. Cassidy points out, that was the seven-day problem. So let me just, again, I know I'm way over time here, but 8F is an interesting animal. But it works in the constructions. Judge Mullen, I'm not complaining in the least about the fact that Hawaiian Dredging, because it couldn't work out with the Boilermakers, and I represent the Boilermakers, went to another trade and said we want an agreement with you. That's fine. I mean, that's the way this works. It's not, I don't like this, but, you know, that's the way it works. The fault here was in Hawaiian Dredging saying to these long-term workers, you're discharged because you were members of the union and your union caused us a problem by not reaching an agreement rather than either doing one of two things is not to show animus. One is to keep them working, which it had every right to do until it signed the agreement with the pipefitters, or say to them, you're all being laid off, we have lots of work, but we need to make new arrangements with the new union, and when we do that, you're welcome to come back to work, but they didn't do that. So the workers went home that day thinking they'd lost these good lifetime jobs because of their membership in the union. Thank you. Thank you. Yes, of course. I disagree with what the workers were told. Counsel was quoting from a letter that was sent to the union, and certainly it could have been a better phrase, but what the workers were told is contract has expired. This case really turns on motive. But you're not trying to back off your February 17th letter. No. No, the letter was sent to the union. It wasn't sent to the employees. I understand, but... So now when you refer to the employees being told something different, what's the record on that? What do you have in the record to support that statement? The record shows that the employees were told that the reason for their separation was, quote, contract has expired. Now where are they told that? Where in the record do we see that? They're told in their separation notices. Where do we see that in the record? I believe it begins at page 311. 311. 311 through 3, I'm sorry, 297 through 310. Okay, thank you. You had hearing testimony to that effect too, did you not? That is correct. The ALJ hearing transcript? That is correct. It is 56 to 59? But what this case really turns on is motive, and the best indication of motive is what the administrative law judge found in the credited testimony, and she found that the reason the welders were laid off or discharged was because there was not a contract in place. She did not find that they were told that they were terminated because of union membership. She actually further credited testimony that it didn't matter to the company whether they were boiler makers or not. So based on the direct evidence, it's clear what the motive was. It's unnecessary to go to Rightline. It's unnecessary to go to Great Dane because those are analytic frameworks to determine, to infer what motive was because usually there's not direct testimony. But here the judge found through direct testimony what the company's motive was. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Millett, Sentelle